UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

---

Michael Curran, Christa Curran and
Kelly Colbert, each individually and on
behalf of all others similarly situated,

Plaintiffs,

v.

Home Partners Holdings LLC, HPA
US1 LLC, and OPVHHJV LLC, d/b/a
Pathlight Property Management,

Defendants.

Court File No.:

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Michael Curran, Christa Curran, and Kelly Colbert, each individually and on behalf of all others similarly situated, bring this action against Home Partners Holdings LLC, HPA US1 LLC and OPVHHJV LLC, d/b/a Pathlight Property Management (collectively "Defendants"), and allege as follows:

### INTRODUCTION

1.       Under Colorado law, "[i]n every rental agreement, the landlord is deemed to warrant that the residential premises is fit for human habitation." Colo. Rev. Stat. § 38-12-503(1). Landlords, not tenants, are responsible not only for ensuring that the homes they rent comply with applicable health and safety laws, but also for responding to their tenants in a timely manner upon notice of conditions that interfere with the tenant's life, health, or safety or the habitability of the premises.

1

2.    Landlords are also responsible for keeping their properties in repair and, with one exception, are not permitted to shift the costs of repairs and maintenance onto tenants.

3.    Nevertheless, Defendants routinely require tenants to enter contracts of adhesion that purport to waive and modify the warranty of habitability as codified in Colorado, through several different lease provisions found in Defendants' uniform adhesion contracts.

4.    In addition, Defendants, through form contracts of adhesion, require tenants to agree to take on maintenance and repair costs that otherwise would be borne by Defendants. In their leases, Defendants misleadingly state that the tenants' rental rates were negotiated and would otherwise be higher but for the tenants' alleged agreement to maintain and repair.

5.    In actuality, Defendants unilaterally set rental rates, without assigning any consideration for the tenants' alleged agreement or the value of their services.

6.    These clauses violate Colorado law, which require landlords of single-family residences to set forth, in an agreement separate from the rental agreement, the list of "specific repairs, maintenance tasks, alterations, and remodeling…" that the tenant has agreed to perform. Colo. Stat. § 38-12-506 (a). That agreement must be "supported by adequate consideration." Colo. Stat. § 38-12-506 (a). In addition, the tenant must have "the requisite skills to perform the work required," *id.* at (b).

7.    Defendants do not provide any consideration to tenants for their alleged agreement, and do not set forth the list of specific repairs or maintenance tasks in a separate writing.

8.    During and at the end of tenancies, and using the same form leases, Defendants routinely pursue their tenants for payment of normal wear and tear damage, or pre-existing or other damage to Defendants' real property, which was not caused by the tenants at all. This conduct also violates the warranty of habitability and statutory consumer protection laws.

9.    Finally, under the leases, Defendants assess tenants with numerous lease administration and property management fees, including but not limited to a "pay-to-pay" utility fee, an HVAC filter fee, late fees, and for the cost of insuring Defendants' property.

10.    The reason for Defendants' use of its misleading form leases is simple: Sophisticated corporate landlords intentionally include unenforceable or misleading clauses in their leases "trusting they could profit from inserting such terms. [These clauses] are likely to mislead tenants into believing that they reflect the legal state-of-affairs."[1]

---

[1] Meirav Furth-Matzkin, *Unenforceable and Misleading Clauses in Consumer Contracts: Evidence from the Residential Real Estate Market*, June 2015, John M. Olin Center for Law, Economics, and Business Fellows, *available at* http://law.harvard.edu/programs/olin_center/; *see also* Furth-Matzkin, *On the Unexpected Use of Unenforceable Contract Terms: Evidence from the Residential Real Estate Market*, 9 Journal of Legal Analysis 1 (2017).

11.    In addition to seeking damages, this action seeks to enjoin Defendants from continuing to use their misleading or unenforceable leases and a return of the monies paid to Defendants through their illegal leases.

## PARTIES

12.    Michael Curran and Christa Curran are adults residing in Colorado Springs, Colorado, and are citizens of Colorado.

13.    Kelly Colbert is an adult residing in Greeley, Colorado and is a citizen of Colorado.

14.    Defendant Home Partners Holdings LLC ("Home Partners") is incorporated in Delaware with its principal place of business in Chicago, Illinois.

15.    Upon information and belief, Defendant Home Partners or one of its subsidiaries operates and purchases homes through separately incorporated limited liability companies ("LLCs"), but Defendant Home Partners (or one of its officers or employees) is a member of those LLCs.

16.    Defendant HPA US1 LLC ("HPA US1"), an LLC incorporated in the State of Delaware with its principal place of business in Chicago, Illinois, is one of these LLCs.

17.    HPA US1 and these other LLCs were, at all relevant times, the agents, servants, employees, alter-egos or joint venture of Defendant Home Partners, and acted within the course and scope of such agency, employment, alter-ego and/or in furtherance of the joint venture, and with the permission and consent of each of the other Defendants.

4

18.    Defendant OPVHHJV LLC, d/b/a Pathlight Property Management ("Pathlight") is a subsidiary, agent, and alter ego of Home Partners of America. Pathlight is incorporated in Texas with its principal place of business in Texas.

## JURISDICTION AND VENUE

19.    This Court has original subject matter jurisdiction over this controversy pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because Plaintiffs and members of the proposed Class are citizens of states different than Defendants' home states, and the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs.

20.    This Court has personal jurisdiction over Defendants because they have conducted substantial business in this District and intentionally and purposefully market, promote, and place their homes into the stream of commerce throughout the United States.

21.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Defendants marketed, advertised, leased and sold the affected homes, as well as conducted extensive business, within this District.

## FACTUAL ALLEGATIONS

I.    **Defendants' Scheme**

22.    Defendants collectively own, lease, and manage approximately 17,000 homes in over 80 markets across the United States.

23.    Defendants operate as alter egos of each other and market themselves as a joint entity. Pathlight states on its website that both Pathlight and Home

Partners "are proud to offer" lease programs to prospective tenants.[2] Pathlight's website contains a Home Partners' logo, demonstrating their interlocking relationship.

24.     In turn, Home Partners' website states, "[f]rom the beginning, Home Partners and Pathlight communicate with residents throughout the entire process. Once the house has closed and the Make-Ready renovations have been completed, Pathlight will send a Welcome Email to residents that outlines the move-in process and answers questions that may arise during the lease term."[3]

25.     Defendant Home Partners is now a subsidiary of Blackstone Inc., a New York City-based investment firm.[4]

26.     In a $6-billion-dollar deal, Blackstone purchased Defendant Home Partners through an investment fund called Blackstone Real Estate Income Trust.

27.     Blackstone is one of many large firms to capitalize off the 2010 foreclosure crisis precipitated by the Great Recession.

28.     In the wake of the 2007 housing market crash, as thousands of American families lost their homes, the federal government launched a pilot program that allowed Blackstone and other private investors, some of whom facilitated the

---

[2] https://www.pathlightmgt.com/ (last visited May 22, 2023).

[3] https://www.homepartners.com/faqs/Move-In-Pathlight/Pathlight-Property-Management-/When-does-Pathlight-become-the-main-point-of-contact-for-incoming-residents (last visited May 22, 2023).

[4] https://www.wsj.com/articles/blackstone-bets-6-billion-on-buying-and-renting-homes-11624359600 (last visited May 22, 2023).

financial crisis in the first place, to purchase swaths of foreclosed homes from Fannie
Mae.

29.    Large private equity groups, hedge funds and other large investors
spent a combined $36 billion on more than 200,000 homes between 2011 and 2017.

30.    In effect, these large entities are building a new corporate landlord-
tenant scheme across the country.[5]

31.    While large corporate entities have been involved in the housing market
since before the 2010 foreclosure crisis, their involvement only continues to grow.
These corporate landlords claim their buying efforts will stabilize the country's most
dilapidated housing markets, and further claim they will be even better landlords
than traditional, local landlords by using their capital to maintain the homes, and
make home rentals easy and affordable.

32.    However, over time, these corporations have displaced individual home
buyers (or individual landlords and property owners) not only in housing markets
decimated by foreclosure, but also in healthy urban, suburban and exurban
residential real estate markets.

33.    Against this background, Home Partners entered the residential real
estate market in 2012 as real estate investment and property management group,
claiming that by purchasing homes on behalf of residents in markets nationwide, they

---

[5] https://www.theatlantic.com/technology/archive/2019/02/single-family-landlords-
wall-street/582394/ (last visited May 22, 2023).

would help thousands of home-seekers live in a home they otherwise were not yet ready to purchase, under terms that best fit their needs.

34.    Defendants state they rent single-family homes to persons in three primary demographics: (1) recent transferees to an unfamiliar or new city or suburb; (2) persons desiring to live in a single-family home, but who lack the creditworthiness to obtain a mortgage; and (3) persons who want to rent a single-family home but who are "uncertain" about home ownership.

35.    Defendants target these demographics through marketing to real estate agents and online and print advertisements that promote the availability of homes.

36.    Defendants market extensively through their own websites as well as local real estate agencies. A recent search of Pathlight's property listing of existing available homes in Colorado yielded over 200 homes.[6]

37.    Defendants operate two rental programs: a lease-to-purchase (LTP) program, which is the primary means through which they acquire single family residences, and a non-lease-to-purchase rental program, through which they rent out homes they have already purchased (NLTP).

38.    The LTP rentals are long-term, up to five years. Each LTP lease contains an automatic renewal provision. The NLTP rental contracts are for one-year terms.

39.    In the context of the LTP program, Defendants represent that prospective customers, working with their real estate agents, can pick a home being

---

[6]https://www.pathlightmgt.com/search?sort=&search_text=&rent=&state=CO&city=Denver&available_date=&beds=&bathrooms= (last visited May 22, 2023).

offered for sale, and that Defendants will buy the home for the prospective customer to rent from Defendants, for up to five years. To induce prospective customers to go through Home Partners and the LTP program, Home Partners represents they "buy it and lease it to you with the peace of mind of locked-in rent amounts and purchase prices. Live in the home as a renter with the option to buy it at any point. At the end of your 1-year lease term, you can renew for another year or walk away with no penalties. No matter what you decide, we are your partner. […] On average, move-in will be 2 weeks after closing to accommodate any necessary repairs found during our home inspection. […] Your agent facilitates the inspection and will make sure all utilities are on."[7]

40.    Defendants together claim that they expend significant effort and resources to purchase a particular home on the prospective tenant's behalf.

41.    Whether a prospective tenant chooses the LTP or NLTP program, Defendants represent for every home that is available for lease, that the home is "[p]rofessionally managed by Pathlight Property Management, the exclusive property manager for Home Partners of America, offering excellent customer service, 24/7 emergency maintenance service, online application and payments, and pet-friendly options."[8]

42.    Defendants also represent their houses are "qualified," "move-in ready" and have passed inspection. Defendants do not share the results of any inspection

---

[7] https://www.homepartners.com/how-it-works  (last visited May 22, 2023).

[8] https://www.pathlightmgt.com/search (last visited May 22, 2023).

reports with their tenants, and thus tenants are unaware of what repairs, if any, were declined or undertaken.

43.     Pathlight also claims "Our team is always ready to handle large service requests, but we kindly ask that residents take care of smaller maintenance issues themselves."[9]

44.     But prospective customers are not provided a complete list of the obligations and "service requests" and "maintenance issues" that they will be required to take on as tenants, which includes but is not limited to pest control, lawn care, and snow removal. Nor do Defendants fully disclose the additional fees tenants will be required to pay under the lease, including for the cost of insuring Defendants' property.

45.     For each house, Defendants set a monthly base rent for each year in which a tenant occupies a house.

46.     Defendants state and admit they do not negotiate these amounts with tenants.[10]

47.     Nonetheless, in contradiction of the foregoing statements, which are provided to the general public and tenants before they sign any lease, Home Partners represents in its form adhesion leases that "The amount of Rent was agreed upon

---

[9] https://app.pathlightmgt.com/help/detail/General-Maintenance/6157473947931/What-are-resident-and-Pathlight-maintenance-responsibilities (last visited May 22, 2023).

[10] https://app.pathlightmgt.com/help/detail/Lease-Information/360043853871/Is-rent-negotiable (last visited May 22, 2023).

based on the express understanding that Tenant will be responsible for the maintenance needs of the Premises as provided in this Lease and in the absence of Tenant's agreement to maintain the Premises at its cost in accordance with the terms of this Lease, Landlord would have charged a higher rent amount."

48. Home Partners does not apply or credit any amount paid in rent or on maintenance or repairs during the lease term to reduce the rent.

49. Nor does it otherwise credit the value of the services tenants provide to maintain Defendants' properties toward the rent, or represent to tenants what the amount of rent would otherwise be but for the agreement to repair and maintain the property.

50. After the tenancy, the tenant must make "any and all repairs, maintenance or replacement required to the Premises that shall be necessary to restore the Premises to the same condition as when Tenant took possession of the Premises (including any work performed by Landlord thereafter) […]"

51. At bottom, and as further described herein, Defendants' marketing is designed to induce and convince prospective customers that they are renting a specially chosen, "qualified" i.e., quality home that is different than, and an alternative to, a traditional rental—and then to convince consumers to agree to take on substantial homecare burdens foisted on tenants by Defendants' adhesive form leases.[11]

---

[11] https://www.homepartners.com/how-it-works/program-summary?position=advantages (last visited May 22, 2023).

52.    Despite their effort to establish an extra-legal relationship with their tenants through these elaborate contracts of adhesion, Defendants cannot write their way out of their statutory legal obligations to their tenants.

## II.    Defendants' Form Contracts Shift the Burden of Maintenance and Repair onto Tenants.

53.    Since 2012, Defendant Home Partners has included provisions in its carefully crafted form leases that illegally purport to shift its repair and maintenance obligations onto tenants. Initially, Defendant Home Partners disclaims in its form leases any obligation to comply with the Covenants of Habitability, stating that "Tenant has agreed to accept possession of the Premises in its current AS-IS, WHERE-IS, WITH ALL FAULTS condition."

54.    Although Colorado law permits tenants and landlords of single-family residences to agree that the tenant "is to perform specific repairs, maintenance tasks, alterations, and remodeling," any agreement must be "set forth in a writing that is separate from the rental agreement...and supported by adequate consideration." Colo. Stat. § 38-12-506 (a). In addition, the tenant must have "the requisite skills to perform the work required." *Id.* at (b).

55.    Defendants do not comply with the statutory requirement that any agreement to maintain or repair be set forth in a separate writing. Instead, within the lease, Defendants bury in fine print a statement that: **"The amount of Rent was agreed upon based on the express understanding that Tenant will be responsible for the maintenance needs of the Premises as provided in this Lease and in the absence of Tenant's agreement to maintain the Premises**

12

**at its cost in accordance with the terms of this Lease, Landlord would have charged a higher rent amount"** despite the fact that Defendants do not negotiate rent (emphasis in original).

56.    These provisions are designed to obscure, mislead, and misrepresent Defendants' true legal obligations to renters, and constitute false statements of fact and law.

57.    Defendants fail to disclose that nothing in their lengthy "Residential Lease Agreement" can abridge a tenant's rights, nor does the lease create anything other than a traditional landlord-tenant relationship.

58.    Defendants' "as-is" and burden-shifting repair provisions mislead consumers about their guaranteed rights and remedies under applicable state law by misrepresenting to consumers that they, not Defendants, are required to keep Defendants' properties in reasonable repair, and further mislead consumers into paying costs associated with Defendants' lease management and administration. Thus, in addition to misrepresenting tenants' rights, Defendants' leases are agreements with tenants that purport to waive or modify the Covenants of Habitability in direct violation of the law.

59.    Defendants' burden-shifting maintenance and repair and lease administration provisions not only contravene the warranty of habitability and other state laws, but also deceptively and misleadingly suggest to tenants that their signatures on the lease constitute a waiver of their right to habitable housing. Such unlawful provisions have and continue to have the effect of fraudulently stripping

13

consumers of their legal rights and burdening them with repair efforts and expenses that the law explicitly requires Defendants to bear.

60.    Defendants obtain an independent inspection and property appraisal, allegedly for the benefit of the tenant, yet under Defendants' policies, the inspection reports and appraisals are not provided to tenants.

61.    Instead, these inspections and appraisals are given to Defendants and undertaken on Defendants' behalf prior to Home Partners' purchase of the home. As owners and property managers of the home, Defendants are in the best position to obtain and provide that information. However, no Defendant discloses the existence of any pre-existing damage to the home of which they may have already been aware.

62.    Nor do Defendants disclose the results of municipal inspections. Accordingly, tenants may not be on notice of conditions at the property to review and report during the tenancy, even conditions such affecting habitability such as prior mold or mildew.

63.    Despite its claim that it "is happy to handle large service requests, and we ask that residents take care of smaller maintenance issues," Pathlight, as the property management arm of Defendants, does not have a local staff to handle these "large service requests." Instead, Pathlight contracts with a third party, SMS Assist, which determines whether a tenant's maintenance request will be fulfilled by a local vendor under policies and procedures established by Pathlight.

64.     If SMS Assist, Pathlight's agent operating under Pathlight policies and procedures, determines that the request is "resident responsibility," the maintenance request will not be fulfilled and will be cancelled.

65.     SMS Assist will also request approval directly from Pathlight for certain repairs. If Pathlight denies the request, the tenant's work order is cancelled.

66.     Because Pathlight either directly or through its agent SMS frustrates tenants' attempts to successfully make maintenance requests, the result is a system whereby tenants, not Defendants, are actually or constructively forced to pay for repairs and maintenance that they are not required to make under the lease or applicable state law.

67.     In addition to paying out of pocket for repairs to Defendants' properties as they arise, or from their security deposits at the end of tenancy, tenants also use their own funds every month to comply with Defendants' so-called "liability coverage" requirement. Tenants are required to procure this "liability coverage" in the amount of $300,000 ($500,000 for a house with a pool) for "damage to our property during your lease term."[12] Defendants require tenants to name the Defendants' entity listed in the lease as an "additional insured party" on the policy and provide "written evidence" of the addition prior to move-in.

68.     Defendants force-place tenants in their own "liability program" for $13 per month if tenants do not procure their own renters' insurance containing this

_____

[12] https://app.pathlightmgt.com/help/detail/Move-In/360043425512/Am-I-required-to-have-renter's-insurance (last visited May 22, 2023).

coverage, with Defendant Home Partners named as an additional insured on the policy. However, Defendants discourage tenants from procuring outside insurance, stating the "cost of outside coverage may depend on your provider, creditworthiness, and other factors. Also, it may or may not cover personal belongings."[13]

69.    What Defendants additionally do not disclose is that they intend for tenants (or their independently procured insurance coverage) to pay for and cover pre-existing, accidental, or normal wear and tear damage to Defendants' buildings and real property, not caused by tenants, which are not covered by the typical renters' insurance policy. In other words, Defendants deliberately foist the burden of insuring their own real property onto tenants.

70.    Defendants also require tenants to pay various fees associated with lease management and administration, including a "Utility Billing Service Fee" (UBSF). The UBSF is a "pay-to-pay" fee for utilities and services that that must be kept in the Landlord and property owners' name. Tenants do not have the option to opt out of the UBSF.

71.    In Colorado, Defendants' pay-to-pay USBF is at least $7.95 per month.

72.    Defendants employ a third party, Conservice, to manage those utilities and services kept in Defendants' names, such as water, trash and sewer. Conservice bills the utilities to the tenants, through a separate bill, but all utility amounts are

---

[13] https://app.pathlightmgt.com/help/detail/Move-In/360043425512/Am-I-required-to-have-renter's-insurance (last visited May 22, 2023).

reflected on the tenants' ledgers and tenants can remit payment directly to Defendants.

73.    Defendant also requires tenants to pay an "HVAC filter fee," in the amount of $15 per month. This amount is non-negotiable. Defendant contracts with a third party, Second Nature, to deliver air filters to tenants every 60 days, and per the form lease and addenda thereto, tenants are not permitted to opt out of this payment obligation and to supply their own air filters purchased from other sources. The lease further requires tenants to install the filters within two days after delivery, for the purpose of ensuring that the "air quality in your home is safe and your system is functioning properly," meaning that the air filter is specifically for the purpose of ensuring the health and safety of the tenants and the habitability of the units. Further, this cost is shifted even where Defendant agrees that furnace and HVAC cleaning and servicing is the landlord's responsibility under the lease agreement.

74.    Finally, Defendants require tenants to pay for Defendants' attorneys to review their ledgers for purposes of determining whether a tenant is allegedly in default on any lease obligation. Defendants charge the tenants for this attorney review, regardless of whether Defendants attempt to enforce any lease obligation through a legal action. These legal fees assessments violate Colorado law, which prescribes "[a]ny fee-shifting clause contained in a rental agreement must award attorney fees to the prevailing party in a court dispute concerning the rental agreement, residential premises, or dwelling unit." Colo. Rev. Stat. § 38-12-801.

75.    Even if Defendants did not enforce their illegal lease provisions, these provisions are nonetheless deceptive because consumers who read them are likely to believe they are enforceable, or that they have contractually waived their legal rights not to be responsible for certain costs, as well as repairs to Defendants' own property.

### III.    Plaintiffs' Experiences

### *Michael and Christa Curran*

76.    The Currans began renting a Home Partners-owned home in December 2019 in Colorado Springs, Colorado.

77.    The Currans elected to enroll in Defendants' five-year Lease-to-Purchase program because even though they were not building equity in the home, Defendants' representations, as described above, led them to believe Defendants would provide a quality, pre-inspected home that would not require substantial upkeep or maintenance, based upon the assurance of quality and inspection provided by Defendants.

78.    The Currans received Defendants' 40-page, 47-clause, form "Residential Lease Agreement," containing numerous attachments and addenda as well as a "Residential Right to Purchase Agreement," drafted by Home Partners' lawyers in approximately 10-point font, for a total of 79 pages. *See* Exhibit A.

79.    The Currans were not provided an opportunity to negotiate the amount of rent, nor the yearly rent increases.

80.    Defendants did not separately negotiate or set forth the list of maintenance and repair responsibilities they required the Currans to assume.

81.    The Currans maintained and paid the requisite renter's insurance through Pathlight's Master Resident Liability Program throughout the duration of their lease.

82.    On or about December 23, 2020, the Currans' furnace stopped working and they had no heat in their home, at a time when Colorado Springs recorded freezing temperatures. The Currans immediately called Pathlight, informing them their infant was on oxygen and they needed a technician immediately to restore the heat. The Pathlight representative created a work order and told the Currans they would receive a call within two hours. The next day, after going without heat overnight, the Currans still had not heard from Pathlight or its vendor. The temperature inside the home had dropped to 28 degrees. The Currans called Pathlight again, and a service technician finally came to examine the furnace, but he could not make any necessary repairs until he received Pathlight's authorization.

83.    The Currans again called and informed Pathlight there was still no heat and their infant was on oxygen, but Pathlight told them it could take several days to restore the heat. A Pathlight representative told the Currans they would furnish space heaters for the home in the meantime, but that they were awaiting for management to approve the work.

84.    After approximately 26 hours with no heat, the Currans' infant's oxygen tank line iced over and they were forced to rush him to Children's Hospital.

85.    After approximately 49 hours without heat or space heaters, the Currans called Pathlight again, and were told they would need to purchase their own

space heaters, or to find a hotel. The Currans were concerned they could not afford a hotel, in light of the medical expenses they were anticipating they would have to incur.

86.     Five days after the Currans provided notice, Pathlight finally approved the work order and sent a technician, but he did not have the necessary parts to complete the repair. Even though the Currans still had no heat, Pathlight refused to pay for their hotel, and their renters insurance only covered the hotel for two days. The Currans hired their own technician and paid approximately $5,955 out-of-pocket to replace the furnace. They have never received reimbursement for this repair. When the Currans called Pathlight to request reimbursement, Pathlight told them to submit a claim through their renters' insurance—even though the Currans did not cause the damage. The Currans did not believe their insurance covered this type of issue and did not submit a claim.

87.     In late December 2020 – early January 2021, the furnace issues caused a shortage in the electrical panel, so the Currans hired an electrician to replace a portion of the paneling and wiring for approximately $2,500. They have never received reimbursement for this repair.

88.     Rather than reimbursing the Currans for these repairs, Pathlight denied reimbursement for the furnace, the electrical panel and hotel and instructed the Currans to file a claim through their renters' insurance.

89.     In 2021, during their lease, the Currans' domestic water service line ruptured, damaging an adjacent sewer line. The Currans had previously notified

Pathlight there was water seeping into the grass on the resident side of the curb stop, but Pathlight did not send a technician to address this issue.

90.     Due to their experience with the furnace, the Currans hired their own technician and paid approximately $8,186 out of pocket to address service line. The Currans called Pathlight to request reimbursement. Pathlight requested copies of the repair invoice, which the Currans sent to the designated Pathlight email address, but Pathlight did not provide reimbursement.

91.     Like thousands of families in Colorado, in 2022, the Currans applied for and received rental assistance for some of their rent obligations, due in part to their medical expenses and out-of-pocket repairs to Defendants' property. The Currans confirmed through the Colorado Department of Local Affairs that Defendants received the check in May 2022. The Currans attempted to communicate with Pathlight multiple times regarding this payment, but Pathlight denied receipt and began eviction proceedings in August 2022. The Colorado Department of Local Affairs contacted Pathlight via email instructing them to cash the check and apply it to the Currans' account.



92.    The Currans ultimately vacated the home in August 2022.

93.    Pathlight retained the Currans' entire security deposit and sent an itemized list of "chargeback items" upon move out, including, among other things, $135 for a new sliding screen door, though there was never a screen in the first place; $450 to paint the interior walls; and $185 to replace the master bedroom door that was reported broken upon move-in.

94.    The Currans estimate they have spent more than 30 hours either on hold, or on the phone with Pathlight dealing with the maintenance issues described herein. The Currans have been placed on hold for 3 – 4 hours at a time, even in emergent circumstances, including when they were left without heat for days.

*Kelly Colbert*

95.    Kelly Colbert and his wife, Gabrielle, began renting a Home Partners-owned home in February 2021 in Greeley, Colorado and enrolled in the Lease to Purchase program.

96.    The Colberts rented through Defendants because Defendants' representations, as described above, led them to believe Defendants would provide a quality, pre-inspected home that would not require substantial upkeep or maintenance, based upon the assurance of quality and inspection provided by Defendants.

97.    The Colberts received Defendants' 45-page, 47-clause, form "Residential Lease Agreement," which includes numerous attachments and addenda as well as a "Residential Right to Purchase Agreement," all drafted by Home Partners' lawyers in approximately 10-point font. *See* Exhibit B.

98.    The Colberts were not provided an opportunity to negotiate the amount of rent, nor the yearly rent hikes.

99.    Defendants did not separately negotiate or set forth the list of maintenance and repair responsibilities they required the Currans to take on.

100.    Defendants automatically enrolled the Colberts in their Master Resident Liability Program. The Colberts have maintained and paid the requisite renter's insurance through this program throughout the duration of their lease.

101.    When the Colberts have called Pathlight to initiate needed repairs to the home, Pathlight representatives have told them a work order will be created, then

proceed to close the work order without explanation and do not send a vendor to address the repair.

102.    As a result, the Colberts believed they needed to undertake and pay out-of-pocket for various repairs themselves. When they requested reimbursement, Pathlight told the Colberts that because they made the repairs themselves, they would not be reimbursed.

103.    Upon move-in, there was an air conditioning unit outside the home, which the Colberts assumed was functioning, but because it was February, they did not turn it on. However, when the temperatures began to rise and the Colberts attempted to cool their home, they discovered the air conditioning unit did not work. They informed Pathlight, who claimed it never represented to the Colberts that the unit was functioning and did not send a vendor to fix it.

104.    Pathlight apparently sent a vendor, who showed up unannounced, to repair the roof in the spring of 2021. The workers left the entire backyard full of glass, nails, old shingles, and dead animals. The Colberts submitted a work order to have the backyard cleared of this debris, as well as their hornet-infested bushes, but the work order was closed without explanation, so the Colberts removed the bushes and cleared the backyard themselves.

105.    The Colberts also informed Pathlight of apparent water damage in the basement and paid out-of-pocket to replace two upper-level toilets that were leaking into the basement. The leak caused a mold infestation, forcing them to rip up the old

carpeting and replace the drywall. Again, Pathlight refused reimbursement as the Colberts did the repairs themselves.

106.    The Colberts have not been able to use their kitchen due to rotting plumbing fixtures that send water flooding into the basement. The Colberts have paid out-of-pocket to fix the sink and rotting cabinets in attempt to stop the water from flowing into the basement, but to no avail. The Colberts informed Pathlight of the condition of their kitchen and requested Pathlight reimburse them for these repairs.

107.    The Colberts have spent more than $4,000 out-of-pocket to address these repairs, but Pathlight told them because they made these repairs themselves, Pathlight would not provide reimbursement.

108.    In August 2022, the Colberts received emergency rental assistance through the State of Colorado and a check was sent to Pathlight to be applied to their ledger. Pathlight did not apply the funds to the Colberts' account and locked them out of the Pathlight resident portal, which the Colberts otherwise would have used to pay their rent and utilities. Thus, the Colberts were unable to pay any amount of rent or utilities, even with their own funds. The Colberts contacted Pathlight and ERAP multiple times to ensure the funds were applied to their account. Pathlight charged them late fees and assessed legal fees, while claiming it never received the check. Pathlight then served an eviction notice in October 2022.

109.    In November 2022, a Weld County judge dismissed the eviction action with prejudice. Pathlight finally credited the account in December 2022. The Colberts requested Pathlight remove various late fees and over $5,500 in "Legal Fees

Recovery" future-dated through April 2024. Despite resolving the rental assistance payment issue, many of these fees remain on their ledger.

110.    In April 2023, because the water leak compromised the basement bathroom ceiling, mice began falling from the ceiling structure. The Colberts placed a maintenance request through the resident portal, but their request was again denied as resident responsibility.



## IV.    Numerous Tenants Nationwide Complain

111.    Plaintiffs are not alone and represent the experiences of similarly situated tenants in Colorado. Across the country and in Colorado, numerous complaints have been lodged against either Home Partners or Pathlight through social media such as LinkedIn or Facebook, through the Better Business Bureau, or in conciliation or housing court litigation, for their failure to return security deposits owed, or to keep their properties in reasonable repair.

112.    As reported by numerous tenants, Defendants often ignore tenant repair requests or wait an inordinate amount of time before addressing the repair.

113.    Pathlight was initially accredited by the Better Business Bureau in December 2016, but its accreditation was revoked in 2022. Pathlight's accreditation has since been reinstated, but the Customer Review page continues to be flooded with a litany of complaints:

> Patti G
> 1/04/2023
> Horrible customer service! Do not rent from this company. I couldn't use half of the house during my 6 month rental period because of backed up sewage. They still charged me the full rate per month and drug their feet for 2.5 months to hire a contractor to cleanup the sewage and remove my damaged property from the site. Then they drug their feet hiring contractors to come replace the flooring and drywall that were ripped out during the cleaning/sanitation.[14]
>
> Erica W
> 12/11/2022
> This company is horrible. I rented for almost a year with them and getting things fixed in the home is a nightmare.

---

[14] https://www.bbb.org/us/tx/plano/profile/property-management/pathlight-property-management-0875-90620230/customer-reviews (last visited May 22, 2023).

I lived in a home with a floor that was hazardous for the entire time I was there. After making several complaints, tripping & falling nothing still wasn't done. I had to leave home early due to home being a hazard. Roof leak caused moldy smell which seeped into my clothing, handbags and shoes. Ceiling from leak started cracking and turning colors. I was being charged for filters that I couldn't use (wrong size) after making several complaints, they still charged me. I was charged for insurance after I was told to get my own insurance but they still charged me after I submitted my insurance. Home was a mess when I moved in and because i was relocating I had to pay for cleaning. Walls, carpet, cracked doors, holes in wall, lawn wasn't maintained and a slew of things I brought to their attention but barely anything was done about it. This company is the worst and I don't see how they're still in business treating their tenants like this. It's horrible and something needs to be done. I paid $3485 to live in a home that had several issues. Never paid rent late. Please help, this can not be right or legal the way this company is treating their tenants.[15]

Heather D
11/08/2022
Your property management company has left my family without hot water since 10/28/22. I was told this was an emergency work order on 10/28/22 when the garage started to flood from a leaking hot water heater. I have spoken to one of your representatives every day since and still have no hot water. We have had two vendors on-site both submitted a quote for the hot water heater replacement and both were denied. Is this your normal practice? My family has occupied the residence less than one month. I have now had to pay out of my own pocket for the repairs only to be told I may not get reimbursed. Please advise!
***************[16]

Paula F
1 star

---

[15] Id.

[16] Id.

12/07/2021
One star is even too much for this company. I am a
professional and work 10-12 hours a day as does my
husband. We choose a rental through this company
because they were offering option to buy, however- it has
been a nightmare and we have only been in our house for
two months. These people are impossible to get ahold of,
when you call you are on hold for 20 minutes to an hour
then you get someone who cannot help you and say they
are transferring you to someone who can and you are on
hold another 20 minutes then get hung up on. I had a
horrible pool company where they were not even
maintaining my pool, they were just checking the water, I
sent this video to Pathlight who sent me an addendum
after several phone calls and emails to maintain my own
pool. I hired a reliable pool company and who comes on
Monday? The creepy pool guy from pathlights company to
check my water and take a picture of my house! "all of this
on video" I was charged 100.00 for a pool maintenance fee
which I should not pay as my pool was not maintenance! I
also was charged a 13.00 liability charge the second month
but I have my own liability insurance and have proven that
to them. I get an email stating it was a mistake then the
next day I get an email telling me I own it! Do not,,,, I
repeat ... I am warning you! I looked over all the red flags
and did it anyway, do not rent from these people! If it looks
too good to be true believe it!!! I am currently on hold the
second time for ten minutes now waiting for the people who
"can really help me" trust me this will not happen! I am
going to the better business bureau and any social media
outlet that I can this is a horrible horrible company![17]

Frank K
1 star
12/06/2021
I moved out, left the property in great shape. The
dishwasher worked the whole time I was in the property.
They said it wouldn't start, they had no proof of it not
working but they replaced the dishwasher without having
a repairman come out. They charged me $750 without
contacting me. They will not return emails or have any one

---

[17] Id.

return calls. They are very unprofessional. Very disappointed with this company ripping me off.[18]

114.    These are not isolated complaints.[19] Hundreds of these complaints exist against Defendants' various entities. Indeed, private Facebook group called "Home Partners of America—Company of Stolen Dreams" contains over 1,500 members.[20]

115.    Defendants have been subject to numerous suits in housing or small claims actions nationwide, as well as additional actions commenced by the undersigned counsel on behalf of their clients in Minnesota[21] and Washington.[22]

116.    Only Defendants, however, are aware of the total number of complaints lodged against them, including through Pathlight's resident portal and 800-number.

117.    As demonstrated, these failures to repair or to agree to repair directly contradict Defendants' representations that they will quickly make repairs and be available 24/7. These representations misrepresent the service Defendants in reality provide. Defendants routinely fail to make requested repairs or make insufficient or untimely repairs.

---

[18] *Id.*

[19] https://pathlight-property-management.pissedconsumer.com/review.html (last visited May 22, 2023).

[20] https://www.facebook.com/groups/HomePartnersofAmericaScandalExpose (last visited May 22, 2023).

[21] *Sewall, et al. v. Home Partners Holdings LLC, et al.,* 27-CV-22-10389  (Minn. Dist. Ct.)

[22] *Richmond, et. al. v. Home Partners Holdings LLC*, et al., 3:22-cv-05704 (W.D. Wash.)

## CLASS ACTION ALLEGATIONS

118.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure

23 and seek to represent a class of:

> All persons who have paid rent and other fees to Defendants pursuant to a
> rental agreement with Defendants in Colorado.

119.    The requirements for class certification under Federal Rule of Civil

Procedure 23 are met as follows:

a.    Plaintiffs are informed and believe, and on that basis allege, that

there are hundreds of persons who have entered into rental

agreements with Home Partners. As such, the members of the Class

are so numerous that joinder of all members in one proceeding would

be impracticable.

b.    There are common questions of law and fact common to the Class,

including without limitation:

i.    Whether Defendants' contracts of adhesion illegally disclaim

the covenants of habitability and violate Colorado landlord-

tenant laws;

ii.    Whether Defendants' lease provisions mislead;

iii.    Whether Defendants' illegally required tenants obtain

insurance to cover damage to Defendants' property;

iv.    Whether Defendants have failed to return security deposits in

full compliance with the law;

     v. Whether Defendants mispresented the nature of their services through advertising with the intent to induce persons to sign their contracts of adhesion;

     vi. Whether Defendants' illegal and unenforceable lease provisions are unfair and deceptive trade practices under Colo. Rev. Stat. §§ 6-1-101, *et. seq.*; and

     vii. Whether the members of the Class are entitled to damages and equitable relief, including injunctive and monetary relief.

c. The claims of the Plaintiffs are typical of the claims of the members of the Class, who entered into rental agreements with Defendants and are now contractually bound to the misleading and unlawful terms of those agreements that breach the covenants of habitability and severely limit any recourse available to Plaintiffs and all members of the Class.

d. The Plaintiffs will fairly and adequately represent the members of the Class and have retained counsel who are competent and experienced in class action and complex litigation.

120. The requirements of Rule 23(b)(2) are met as described below in Plaintiffs' request for injunctive relief.

121. The requirements of Rule 23(b)(3) are met in that:

a. The questions of law common to the members of the Class predominate over any questions affecting only individual members.

b.  A class action is superior to other methods for the fair and efficient
adjudication of this controversy. Because the damages suffered by
many individual members of the Class may be relatively small in
relation to the costs of litigation, the expense and burden of
individual litigation make it difficult, if not impossible, for members
of the Class to redress the wrongs done to them individually.
Furthermore, many of the members of the Class may be unaware
that claims exist against Defendants.

c.  Plaintiffs know of no difficulty that will be encountered in the
management of this litigation that would preclude its maintenance
as a class action. The names and addresses of the members of the
Class are available from Defendants. Notice will be provided to the
members of the Class via first class mail and/or by the use of
techniques and a form of notice similar to those customarily used in
class actions.

**COUNT I**
**VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT**
**COLO. REV. STAT. §§ 6-1-101 *et seq.***

122.   Plaintiffs re-allege all prior paragraphs of this Complaint.

123.   Plaintiffs are "persons" as defined by Colo. Rev. Stat. § 6-1-102(6).

124.   The Colorado Consumer Protection Act ("Colorado CPA") prohibits
unfair, unconscionable, and deceptive acts or practices in the course of the person's
business, vocation, or occupation. Colo. Rev. Stat. § 6-1-105.

125.    Defendants, through their agents, employees and/or subsidiaries, have repeatedly violated the Colorado CPA by knowingly and intentionally concealing, suppressing, misrepresenting, omitting, and/or failing to disclose material facts regarding Defendants' rental properties, rental practices, and practices as a landlord.

126.    Those practices include Defendants' unlawful lease provisions that deceive and mislead consumers into believing they (a) cannot negotiate their monthly rental rates or cannot negotiate the purchase prices of the home, while forcing them to sign agreements stating they in fact did, (b) must make repairs to their rental homes that are not the tenants' responsibility, (c) must pay for renters' insurance or use Defendants' hand-picked "liability coverage" every month to cover the maintenance of and physical damage to Defendants' rental homes, and (d) representing to consumers that they take the property "AS IS" and must make and pay for maintenance and repairs to Defendants' rental homes, when the law requires that Defendants, not tenants, keep the homes in compliance with applicable health and safety laws.

127.    Defendants intended to induce Plaintiffs and the Colorado Class to rely on their misrepresentations and omissions in promoting and renting Defendants' rental properties.

128.    Thus, Defendants' conduct, practices, and actions described in this Complaint, with the intent that others rely thereon in connection with Defendants' rental practices, constitute multiple separate violations of the Colorado CPA.

129.    Defendants' unfair or deceptive acts or practices had a tendency or capacity to mislead and create a false impression in consumers, and were likely to, and did in fact, deceive reasonable consumers, including Plaintiffs and the Colorado Class, about the true nature of Defendants' rental properties, rental practices, and landlord practices.

130.    Defendants' misrepresentations and omissions were material to Plaintiffs and the Colorado Class because they impact basic human needs: shelter, health and safety.

131.    Had Plaintiffs and the Colorado Class known the truth and true value of Defendants' rental properties, they would not have rented a home through Defendants, or they would have paid significantly reduced rent.

132.    Plaintiffs and the Colorado Class had no way of discerning Defendants' misrepresentations were false and misleading, and did not and could not have unraveled Defendants' deception on their own.

133.    Defendants had an ongoing duty to consumers, including Plaintiffs and the Colorado Class, not only to refrain from their unfair and/or deceptive representations and practices, but Defendants also had a duty to disclose all material facts concerning the rental properties because they possessed exclusive knowledge of the condition of and defects within the properties and the rental services they would actually provide.

134.    As a direct and proximate result of Defendants' violations of the Colorado CPA, Plaintiffs and the Colorado Class have suffered, and will continue to

suffer injury, ascertainable losses of money and/or property, and monetary and non-monetary damages, including not receiving the benefit of their bargain.

135.    Defendants' unlawful acts and practices affect the public interest because hundreds, if not thousands, of renters and prospective home buyers in Colorado are targeted by Defendants' omissions and misstatements, and these omissions and misstatements have the potential to deceive thousands of consumers in the future. The prevention of such false and misleading information is in the public interest.

136.    Plaintiffs and the Colorado Class seek an order enjoining Defendants' unfair or deceptive acts and practices, actual damages, reasonable attorney fees and any other just and proper relief available pursuant to Colo. Rev. Stat. § 6-1-113.

## COUNT II
## VIOLATION OF COLO. REV. STAT. § 38-12-503 AND COLO. REV. STAT. § 38-12-506

137.    Plaintiffs re-allege all prior paragraphs of this Complaint.

138.    Under Colo. Rev. Stat. § 38-12-503(1), in every rental agreement, the landlord is deemed to warrant that the residential premises is fit for human habitation.

139.    A landlord breaches the warranty of habitability under Colo. Rev. Stat. § 38-12-503(1) if a residential premises is uninhabitable, in a condition that materially interferes with the tenant's life, health, or safety; and the landlord has received reasonably complete written or electronic notice of these conditions and

failed to commence remedial action by employing reasonable efforts within the time-period prescribed by Colo. Rev. Stat. § 38-12-503(b).

140.    Defendants have breached the warranty of habitability in multiple ways, including, but not limited to:

    a.  Failing to remedy conditions causing mold and dampness;

    b.  Failing to remedy malfunctioning appliances, plumbing and gas facilities, heating facilities, and electrical equipment;

    c.  Failing to remedy pest infestations;

    d.  Failing to maintain floors, stairways and railings in good repair;

    e.  Failing to comply with all applicable building, housing, and health codes.

141.    Defendants have also repeatedly breached the warranty of habitability under Colorado law by:

    a.  Requiring consumers to sign leases stating that they have agreed to perform maintenance and repairs and that such amounts have been negotiated, when in fact there is no writing separate from the rental agreement, supported by adequate consideration, as required by Colo. Stat. § 38-12-506;

    b.  Representing to consumers that they must make and pay for all repairs to Defendants' rental homes, when in reality, the law requires that Defendants, not tenants, warrant that the residential premises is fit for human habitation.

37

    c.  Regarding Defendants' written agreements with tenants to perform specific repairs and maintenance, Defendants are in violation of Colo. Rev. Stat. §38-12-506 by inserting these obligations into their form leases rather than an agreement that is separate and distinct from their leases, by entering into these agreements in bad faith, with inadequate consideration, and by foisting the burden of maintenance and repair onto tenants who do not have the requisite skills to perform the work required.

142.  No Plaintiff nor Colorado Class Members' actions have prevented Defendants from curing the conditions underlying the breach of the warranty of habitability.

143.  Plaintiffs and the Colorado Class are entitled to injunctive relief, damages, and any other relief the court deems just and proper.

## COUNT III
## SECURITY DEPOSITS – WRONGFUL WITHHOLDING
## COLO. REV. STAT. § 38-12-103, *et seq.*

144.  Plaintiffs re-allege all prior paragraphs of this Complaint.

145.  Defendants retain tenants' security deposits to cover normal wear and tear in violation of Colo. Rev. Stat. § 38-12-103.

146.  Defendants also unlawfully retain tenants' security deposits to cover items that didn't exist in the home prior to move-in, as well as items that were damaged prior to move-in and reported in accordance with Defendants' pre-lease condition form policy.

38

147.    Plaintiffs and the Colorado class are entitled to damages, costs, penalties and other equitable relief as the court deems appropriate pursuant to Colo. Rev. Stat. § 38-12-103(3).

## COUNT IV
## RESCISSION

148.    Plaintiffs re-allege all prior paragraphs of this Complaint.

149.    Defendants control virtually every aspect of Plaintiffs' lease agreements as set forth in the general allegations hereof at paragraphs 44 through 75.

150.    Defendants' lease agreements illegally and unfairly advantage tenants through their misleading statements and deceptive practices, as described in this Complaint, with the intent that others rely thereon in connection with the rental or sale of their residential properties. Those practices include Defendants' unlawful lease provisions that deceive and mislead consumers into believing they (a) cannot negotiate their monthly rental rates or cannot negotiate the purchase prices of the home, while forcing them to sign agreements stating they in fact did, (b) must make all repairs to their rental homes because they are rented in an "AS-IS" condition, and (c) must pay for renters' insurance or use Defendants' hand-picked "liability coverage" every month to cover the maintenance of and physical damage to Defendants' rental homes.

151.    Defendants represent to consumers that they must pay for their renters' insurance every month to cover all maintenance of their rental homes when Colorado law requires they, not their tenants, maintain the premises in accordance with

39

Colorado's warranty of habitability, illegally shifting the burden of maintaining Defendants' own properties onto their renters.

152.    Defendants' form lease agreements are unconscionable contracts of adhesion, which are unenforceable as contrary to the public interest, policy and law.

153.    Defendants' lease agreements deny consumers the legally cognizable warranty of habitability.

154.    Plaintiffs and the Class have incurred out-of-pocket expenses for maintenance costs associated with their leases that should never have been their responsibility to pay as a direct result of the terms of the lease agreement.

155.    As a direct and proximate result of Defendants' conduct, Defendants have received substantial benefits to which they have no entitlement, at Plaintiffs' and Class Members' expense, including maintenance costs, rent hikes, insurance premiums and other expenses.

156.    Plaintiffs and the Class are entitled to compensation for all of the expenses they were illegally required by Defendants to bear, and that Defendants should have but did not pay.

## COUNT V
## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

157.    Plaintiffs re-allege all prior paragraphs of this Complaint.

158.    Every agreement between Plaintiffs and Defendants includes terms and conditions which are not formally expressed but are implied by law. These implied terms are as binding as the terms that are in the written agreement.

159. Defendants' residential leases contain a contractual duty of good faith and fair dealing that includes, but is not limited to, maintaining their rental properties in accordance with Colo. Rev. Stat. §38-12-503, as well as refraining from the unfair, deceptive and misleading practices described herein.

160. Defendants control the performance of virtually every term of their contractual relationship with tenants, including, but not limited to:

    a.  the type of insurance tenants must carry and what that insurance covers;

    b.  the manner in which tenants pay utilities;

    c.  the type, cost and delivery of mandatory HVAC filter replacements;

    d.  whether Defendants or tenants are responsible for certain repairs;

    e.  whether Defendants will agree to make requested repairs and maintenance;

    f.  the length of time tenants must wait for maintenance and repairs to be completed (if at all);

    g.  forcing tenants to be on-site at the rental property when maintenance and repairs are to occur;

    h.  whether Defendants will accept rent payment through the resident portal; and

    i.  deductions from tenants' security deposits upon termination of the lease.

161.    Defendants' residential leases contain provisions that defer a decision regarding performance terms of the contract, leaving Defendants with the sole power to control the terms of performance after formation.

162.    Defendants' obligation to abide by the duty of good faith and fair dealing is heightened by the imbalance of power between Plaintiffs and Defendants. This substantial imbalance allows Defendants to implement the business scheme described herein and incorporated by reference. Defendants maintain unilateral discretion under their written agreements, which they abuse in bad faith.

163.    Defendants' actions and uniform course of conduct, including, but not limited to their unfair and deceptive practices, constructive refusal to make repairs and maintenance, and their unduly delay of repairs, breach their duty of good faith and fair dealing and unjustifiably hinder Plaintiffs' performance under the contracts.

164.    Further, Defendants' practices defy the reasonable expectations of Plaintiffs and the putative class in entering into the landlord-tenant relationship, including, without limitation:

      a.  Their reasonable expectations that the property will be maintained by the landlord;

      b.  Their reasonable expectations that the property is "professionally managed" with "excellent customer service" and "24/7 emergency maintenance service";[23]

---

[23] https://www.pathlightmgt.com/search (last visited May 22, 2023).

42

c. Their reasonable expectations that their landlord will make timely repairs and maintenance;

d. Their reasonable expectations that they will not be responsible for paying out-of-pocket for maintenance and repairs to the landlord's property; and

e. Their reasonable expectations that they are renting a home that is not ridden with defects and does not require substantial upkeep.

165.   Defendants have acted in bad faith by refusing to perform their contractual duties, effectively foisting the burden of maintaining their homes onto their tenants to generate more revenue and cut their own costs.

166.   Plaintiffs have not impeded Defendants from performing their obligations under their lease agreements in any way.

167.   As a direct and proximate cause of Defendants' breach of the implied duty of good faith and fair dealing, Plaintiffs and the putative class have suffered injury and damages.

**COUNT VI**
**UNJUST ENRICHMENT**

168.   Plaintiffs re-allege all prior paragraphs of this complaint.

169.   Plaintiffs and the Colorado Class conferred a benefit on the Defendants by, among other things, paying rent and for the costs of maintenance that Defendants should have paid.

170.   Defendants voluntarily accepted and retained through today the benefits conferred by Plaintiffs and the Colorado Classes' payments for rent and the

costs of maintenance. The circumstances are such that it would be inequitable for the Defendants to retain these payments.

171.   Defendants consciously accepted the benefits that Plaintiffs and the Proposed Class conferred and those benefits were not conferred gratuitously.

## COUNT VII
## DECLARATORY RELIEF

172.   Plaintiffs re-allege all prior paragraphs of this Complaint.

173.   An actual controversy has arisen between Plaintiffs and the Proposed Class on one hand, and Defendants on the other hand, relating to the following matters:

a.     Whether Defendants have unlawfully failed to maintain the homes rented by Plaintiffs and the Proposed Class.

b.     What amounts Plaintiffs and the Proposed Class are entitled to receive in compensation.

c.     Whether Defendants unlawfully require tenants to procure renters' insurance to cover damage not caused by tenants to Defendants' building and structures, or to force place them in the "liability coverage" of Defendants' choosing.

d.     Whether the provisions of Defendants' form leases violate the warranty of habitability and illegally thrust the burden of repair onto to tenants.

e.    Whether tenants can be forced to sign agreements stating they
either negotiated the rental or purchase price of the home when
in fact, no negotiations took place.

f.    Whether Defendants' policy and practice of assessing their
attorneys' fees against tenants violates Colo. Rev. Stat. § 38-12-
801.

174.    Plaintiffs and the Proposed Class further seek entry of declaratory
judgment in their favor which declares Defendants' practices as unlawful, and which
provides for recovery of sums determined by this Court to be owed by Defendants to
the Plaintiffs and Proposed Class.

## COUNT VIII
## INJUNCTIVE RELIEF

175.    Plaintiffs re-allege all prior paragraphs of this Complaint.

176.    Defendants will continue their illegal practices and unlawfully breach
the warranty of habitability as codified in Colorado.

177.    Plaintiffs and the Proposed Class have been injured and damaged, and
are threatened with injury and damage, by Defendants' continued, unlawful refusal
to maintain the homes Defendants themselves own, as well as through Defendants'
continued use of misleading, unconscionable lease agreements, and Plaintiffs and the
Proposed Class have no adequate remedy at law.

178.    Defendant has acted, and threatened to act, on grounds generally
applicable to the individual members of the Proposed Class, thereby making

appropriate preliminary and permanent injunctive relief enjoining Defendants and their agents from continuing the unlawful practices alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask this Court to award judgment against Defendants as follows:

1.      Declaring that Defendants' actions, as set forth above, constitute multiple, separate violations of Colo. Rev. Stat. §§ 6-1-101, *et seq*., Colo. Rev. Stat. §§ 38-12-501, *et seq*., and that Defendants' form lease agreements are void;

2.      Enjoining Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parents or controlling entities, subsidiaries, and all other persons acting in concert or participation with them, from engaging in deceptive practices and making false or misleading statements in violation of Colo. Rev. Stat. §§ 6-1-101, *et seq*.;

3.      Enjoining Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parents or controlling entities, subsidiaries, and all other persons acting in concert or participation with them, from breaching the warranty of habitability under Colo. Rev. Stat. § 38-12-503;

4.      Awarding judgment against Defendants for restitution and disgorgement under the general equitable powers of this Court and any other authority for all persons injured by Defendants' acts as described in this Complaint;

5.     Awarding Plaintiffs their costs and reasonable attorneys' fees, as authorized by Colo. Rev. Stat. § 6-1-113, Colo. Rev. Stat. § 38-12-105, Colo. Rev. Stat. § 38-12-507, as provided by applicable law or equity, and as the Court deems just and proper.

6.     Awarding prejudgment interest; and

7.     Granting such further relief as provided by law or equity, or as the Court deems appropriate and just.

|  | **HELLMUTH & JOHNSON, PLLC** |
|---|---|
| Date:  May 22, 2023 | |
| | By: */s/ Anne T. Regan* |
| | Anne T. Regan (MN #0333852) |
| | Lindsey L. Larson (MN #0401257) |
| | 8050 West 78th Street |
| | Edina, MN 55439 |
| | (952) 941-4005 |
| | aregan@hjlawfirm.com |
| | llabellelarson@hjlawfirm.com |
| | |
| | Susan E. Ellingstad |
| | Joseph C. Bourne |
| | **Lockridge Grindal Nauen P.L.L.P.** |
| | 100 Washington Avenue S., Suite 2200 |
| | Minneapolis, MN 55401 |
| | (612) 339-6900 |
| | seellingstad@locklaw.com |
| | jcbourne@locklaw.com |
| | |
| | Scott Harris |
| | Michael Dunn |
| | **Milberg Coleman Bryson Phillips Grossman, PLLC** |
| | 900 W. Morgan St. |
| | Raleigh, NC 27603 |
| | (919) 600-5000 |
| | sharris@milberg.com |
| | michael.dunn@milberg.com |

**ATTORNEYS FOR PLAINTIFFS**